**Lansing, Michigan**

# Opinion

Chief Justice:          Justices:
Robert P. Young, Jr.   Michael F. Cavanagh
                        Marilyn Kelly
                        Stephen J. Markman
                        Diane M. Hathaway
                        Mary Beth Kelly
                        Brian K. Zahra

FILED JULY 27, 2012

S T A T E   O F   M I C H I G A N

SUPREME COURT

PEOPLE OF THE STATE OF MICHIGAN,

      Plaintiff-Appellee,

v                                                                No.143343; 143344

JARED RAPP,

      Defendant-Appellant.

BEFORE THE ENTIRE BENCH

HATHAWAY, J.

      At issue in this case is whether Michigan State University (MSU) Ordinance, § 15.05 is facially unconstitutional. The Court of Appeals reversed the circuit court's conclusion that the ordinance is unconstitutional under *City of Houston, Texas v Hill*, 482 US 451; 107 S Ct 2502; 96 L Ed 2d 398 (1987).[1] Because we agree with the circuit court's analysis and conclude that the language in the ordinance making it an offense to "disrupt the normal activity" of a protected person is facially overbroad, as articulated by

---

[1] *People v Rapp*, 293 Mich App 159; 809 NW2d 665 (2011).

the United States Supreme Court in *Hill*, we reverse the portion of the Court of Appeals' judgment pertaining to the constitutionality of MSU Ordinance, § 15.05, and we reinstate the circuit court's decision with regard to this issue to the extent that the circuit court held that the quoted language is facially unconstitutional.

Also at issue is whether MCR 7.101(O) provides for taxation of costs in criminal cases. The Court of Appeals held that costs may not be assessed under MCR 7.101(O) in criminal matters.[2] We agree with the Court of Appeals and, therefore, affirm that portion of its judgment.

## I. FACTS AND PROCEDURAL HISTORY

This case arises from a parking citation that defendant received when his car was parked in an MSU parking structure. On the day the citation was issued, MSU parking enforcement employee Ricardo Rego was working on campus. Defendant confronted Rego and asked if Rego was the one who had issued the citation. Defendant was shouting, which led Rego to believe that defendant was acting aggressively. Rego got into his service vehicle and called the campus police.[3] Approximately 10 to 15 minutes passed before the police arrived. During that time, Rego sat in his service vehicle and completed the process for having an adjacent vehicle towed, while defendant stood outside the service vehicle and took pictures of Rego with a camera phone.

---

[2] *Id*. at 167.

[3] Rego testified that this was standard procedure when a person is upset about a parking citation.

2

Defendant was charged with the misdemeanor offense of violating MSU Ordinance, § 15.05.[4] A district court jury convicted defendant of violating the ordinance. On appeal, the circuit court reversed the conviction on the basis that the ordinance was unconstitutionally overbroad on its face. The circuit court also granted defendant's motion brought pursuant to MCR 7.101(O) to tax costs against the prosecution.

The Court of Appeals reversed the circuit court's decision and held that the ordinance is not facially overbroad, and defendant is not entitled to costs.[5] This Court granted defendant's application for leave to appeal and asked the parties to address "(1) whether Michigan State University Ordinance 15.05 is facially unconstitutional under *City of Houston v Hill*, 482 US 451 (1987), and (2) whether MCR 7.101(O) allows taxation of costs in criminal cases appealed in the circuit court."[6]

---

[4] MSU Ordinance, § 15.05 provides:

> No person shall disrupt the normal activity or molest the property of any person, firm, or agency while that person, firm, or agency is carrying out service, activity or agreement for or with the University.

[5] *Rapp*, 293 Mich App at 160, 167. The Court of Appeals did not rule on whether the ordinance is unconstitutional as applied to the facts of this case and, instead, remanded this matter to the circuit for resolution of that issue.

[6] *People v Rapp*, 490 Mich 927 (2011).

3

## II.  STANDARD OF REVIEW

This Court reviews de novo questions of constitutional law.[7]  This Court presumes that ordinances are constitutional, and the party challenging the validity of the ordinance has the burden of proving a constitutional violation.[8]

## III.  ANALYSIS

We first address whether MSU Ordinance, § 15.05 is facially unconstitutional.[9] When considering a "facial" challenge to the breadth of a law on First Amendment grounds,[10] this Court considers "not merely the sporadic abuse of power by the censor but the pervasive threat inherent in its very existence that constitutes the danger to freedom of discussion."[11]

---

[7] *People v Armstrong*, 490 Mich 281, 289; 806 NW2d 676 (2011).

[8] *Fass v Highland Park (On Rehearing)*, 321 Mich 156, 161; 32 NW2d 375 (1948); *Cady v Detroit*, 289 Mich 499, 505; 286 NW 805 (1939).

[9] We recognize that a facial constitutional challenge is difficult to mount.  See *Broadrick v Oklahoma*, 413 US 601, 615-616; 93 S Ct 2908; 37 L Ed 2d 830 (1973).

[10] "The First Amendment of the United States Constitution, as applied to the States through the Fourteenth Amendment, provides that the government 'shall make no law . . . abridging the freedom of speech.'"  *Rochester Hills v Schultz*, 459 Mich 486, 489; 592 NW2d 69 (1999), quoting US Const, Am 1.  This Court has recognized that a party may challenge the "breadth" of "a law written so broadly that it may inhibit the constitutionally protected speech of third parties, even though the party's own conduct may be unprotected."  *In re Chmura*, 461 Mich 517, 530; 608 NW2d 31 (2000).

[11] *Thornhill v Alabama*, 310 US 88, 97; 60 S Ct 736; 84 L Ed 1093 (1940).

Before ruling that a law is unconstitutionally overbroad, this Court must determine whether the law "reaches a substantial amount of constitutionally protected conduct."[12] The United States Supreme Court has held that criminal statutes must be scrutinized with particular care,[13] and those that prohibit a substantial amount of constitutionally protected conduct may be facially overbroad even if they have a legitimate application.[14] However, "invalidating a law that in some of its applications is perfectly constitutional—particularly a law directed at conduct so antisocial that it has been made criminal—has obvious harmful effects."[15] Thus, a statute's overbreadth must "be *substantial*, not only in an absolute sense, but also relative to the statute's plainly legitimate sweep."[16]

In *Hill*, the United State Supreme Court considered the constitutionality of an ordinance that made it unlawful to "in any manner oppose, molest, abuse or interrupt" a police officer.[17] The Court concluded at the outset that this language prohibited verbal

---

[12] *Village of Hoffman Estates v The Flipside, Hoffman Estates, Inc*, 455 US 489, 494; 102 S Ct 1186; 71 L Ed 2d 362 (1982).

[13] *Winters v New York*, 333 US 507, 515; 68 S Ct 665; 92 L Ed 840 (1948).

[14] *Hill*, 482 US at 458-459, citing *Kolender v Lawson*, 461 US 352, 359 n 8; 103 S Ct 1855; 75 L Ed 2d 903 (1983).

[15] *United States v Williams*, 553 US 285, 292; 128 S Ct 1830; 170 L Ed 2d 650 (2008).

[16] *Id.*

[17] *Hill*, 482 US at 455. The full text of the ordinance in *Hill* made it "unlawful for any person to assault, strike or in any manner oppose, molest, abuse or interrupt any policeman in the execution of his duty, or any person summoned to aid in making an arrest." *Id*. However, only the portion of the ordinance making it unlawful to "oppose, molest, abuse or interrupt" an officer was enforceable because the remaining language making it unlawful to "assault" or "strike" a police officer was preempted by the Texas Penal Code. *Id*. at 460.

interruptions and, therefore, implicated constitutionally protected speech under the First Amendment.[18] The Court first noted that the ordinance was not limited in any way to fighting words or obscene language.[19] Instead, the ordinance imposed a blanket prohibition on speech that interrupts an officer in any manner.[20] Expressly clarifying that the Constitution prohibits making such speech a crime, the Court explained that "[t]he freedom of individuals verbally to oppose or challenge police action without thereby risking arrest is one of the principal characteristics by which we distinguish a free nation from a police state."[21] While the Court acknowledged the difficulty of drafting precise laws, it reiterated that it would invalidate those laws "that provide the police with unfettered discretion to arrest individuals for *words or conduct* that annoy or offend them."[22]

*Hill* also stated that as the Court had "observed over a century ago, '[i]t would certainly be dangerous if the legislature could set a net large enough to catch all possible offenders, and leave it to the courts to step inside and say who could be rightfully detained, and who should be set at large.'"[23] The Court noted that the ordinance's plain

---

[18] *Id*. at 461.

[19] *Id*. at 462.

[20] *Id*.

[21] *Id*. at 462-463.

[22] *Id*. at 465 (emphasis added).

[23] *Id*. at 465-466, quoting *United States v Reese*, 92 US (2 Otto) 214, 221; 23 L Ed 563 (1876).

language prohibiting opposing, molesting, abusing, or interrupting a police officer in any manner could be violated on numerous occasions every day.[24] Nevertheless, only those individuals that the police chose to arrest would be charged with violating the ordinance.[25] *Hill* concluded that because the "ordinance criminalizes a substantial amount of constitutionally protected speech, and accords the police unconstitutional discretion in enforcement," it was substantially overbroad and facially invalid.[26]

In this case, we address the constitutionality of MSU Ordinance, § 15.05, which provides:

> No person shall disrupt the normal activity or molest the property of any person, firm, or agency while that person, firm, or agency is carrying out service, activity or agreement for or with the University.

"The first step in overbreadth analysis is to construe the challenged statute" because "it is impossible to determine whether a statute reaches too far without first knowing what the statute covers."[27] This ordinance makes it a crime to "disrupt the normal activity . . . of any person, firm, or agency . . . carrying out service, activity or agreement for or with the University." Defendant argues that this language is facially overbroad because it

---

[24] *Hill*, 482 US at 466-467.

[25] *Id.*

[26] *Id.* at 466.

[27] *Williams*, 553 US at 293.

7

substantially infringes on First Amendment rights. We agree with defendant and hold that the phrase "disrupt the normal activity" in the ordinance is facially overbroad.[28]

The MSU ordinance prohibits disruptions but does not specify the types of disruptions that are prohibited. Thus, the plain language of the ordinance allows its enforcement for even *verbal* disruptions. Moreover, like the ordinance that the United States Supreme Court invalidated in *Hill*, the verbal disruptions that the MSU ordinance criminalizes are not limited to those containing fighting words or obscene language. Instead, the MSU ordinance explicitly criminalizes any disruption of the normal activity of persons or entities carrying out activities for or with MSU. Not only does the ordinance fail to limit the types of disruptions that are prohibited, it also protects a much broader class of individuals than the ordinance at issue in *Hill*. The plain language of this ordinance allows it to be enforced against *anyone* who disrupts in *any* way *anyone* carrying out *any* activity for or with MSU. Like the ordinance in *Hill*, which was "admittedly violated scores of times daily,"[29] the MSU ordinance could be violated

---

[28] Aside from the phrase "disrupt the normal activity," the MSU ordinance also prohibits "molest[ing] the property" of a protected person. Because this alternative basis for enforcement does not implicate speech, we find no need to address whether it is facially overbroad. Moreover, MSU Ordinance, § 49.01 provides that "[i]f any provision of these ordinances or part thereof shall be adjudged invalid by a court . . . , then such adjudication shall not affect the validity of . . . any provision or part thereof not so adjudged invalid." Accordingly, the language in the ordinance prohibiting someone from "molest[ing] the property of any person, firm, or agency while that person, firm, or agency is carrying out service, activity or agreement for or with the University" remains in force.

[29] *Hill*, 482 US at 466.

8

numerous times throughout any given day given that there are seemingly infinite ways in which someone might "disrupt" another who is engaged in an "activity" for or with MSU. Thus, we believe that this ordinance, just like the ordinance in *Hill*, "criminalizes a substantial amount of constitutionally protected speech . . . ."[30]

The Court of Appeals found *Hill* distinguishable from this case because the *Hill* ordinance specifically protected police officers who have the power to arrest violators at the officers' discretion, while the MSU ordinance only prohibits the disruption of MSU employees who do not necessarily have the power to arrest violators.[31] We disagree with this distinction. The MSU ordinance prohibits the disruption of MSU police officers while they are carrying out their duties for the university, and those police officers have the explicit power to enforce the ordinance and arrest violators.[32] Thus, the concerns that

---

[30] *Id.*

[31] The Court of Appeals also observed that the ordinance "prohibits the disruption of MSU *employees . . .* performing their duties." *Rapp*, 293 Mich App at 165 (emphasis added). While the ordinance does prohibit the disruption of MSU employees performing their duties, the plain language of this ordinance does not apply to MSU employees *only*. Rather, it prohibits the disruption of *anyone*, MSU employee or not, who is "carrying out service, activity or agreement for or with the University."

[32] MSU Ordinance, § 4.01 states:

> The Board of Trustees entrusts the Police Chief and Director of the Department of Police and Public Safety . . . and subordinate officers, including police officers, and also traffic control officers, parking enforcement officers, and other special or limited duty officers, whom he or she appoints, with responsibility for enforcing these ordinances.

Furthermore, MSU Ordinance, § 5.01 allows MSU police officers to "apprehend and arrest any person in violation of any provision of these ordinances and . . . make

9

*Hill* had regarding "[t]he freedom of individuals verbally to oppose or challenge police action without thereby risking arrest" apply equally to the MSU ordinance.[33]

Moreover, the distinction regarding whether an individual protected by the ordinance has the power to arrest is an irrelevant one. An MSU student, for example, enrolled in classes on campus is undoubtedly carrying out an activity with MSU and, therefore, is protected by the ordinance. Nothing in the plain language of the ordinance prevents a student who simply feels that he or she has been disrupted by the actions or words of another person from seeking enforcement of this ordinance. Nor does the ordinance language prevent a police officer from choosing to enforce the ordinance when there is a complaint or simply when the officer witnesses somebody disrupting another person's activity.[34] While not all protected individuals have the same power as a police officer to arrest, the ordinance is nonetheless a criminal statute that subjects the violator

complaint against such violator before any judge or judicial officer having jurisdiction . . . ."

[33] *Hill*, 482 US at 462-463. The prevalence of daily ordinance violations alone does not make the law constitutionally suspect; rather, what makes the law constitutionally suspect is the prevalence of violations that encompass protected speech and the threat of selective enforcement of the ordinance against that protected speech.

[34] The United States Supreme Court has explained that "there must be a realistic danger that the statute itself will significantly compromise recognized First Amendment protections of parties not before the Court for it to be facially challenged on overbreadth grounds." *Los Angeles City Council v Taxpayers for Vincent*, 466 US 789, 801; 104 S Ct 2118; 80 L Ed 2d 772 (1984). However, the Court cautioned in *Hill* that "if some constitutionally unprotected speech must go unpunished, that is a price worth paying to preserve the vitality of the First Amendment." *Hill*, 482 US at 462 n 11. The Court concluded that the ordinance in *Hill* was violated many times on a daily basis. Similarly, there is a realistic danger that the broad prohibition in the MSU ordinance is violated regularly.

10

to a misdemeanor conviction and provides someone who *does* have the power to arrest with the opportunity to do so whenever a protected individual is disrupted.[35] Accordingly, this ordinance can be said to "provide the police with unfettered discretion to arrest individuals for *words or conduct* that annoy or offend them," just as the ordinance in *Hill* did.[36] Thus, like the unconstitutional ordinance in *Hill*, the MSU ordinance is "susceptible of regular application to protected expression," regardless of whether the protected individual has the power to arrest.[37]

The Court of Appeals further attempted to distinguish *Hill* because the ordinance in that case used the word "interrupt," while the MSU ordinance uses the word "disrupt."[38] *The American Heritage Dictionary of the English Language* (2006), quoted by the Court of Appeals, defines "disrupt" as "[t]o throw into confusion or disorder" or "[t]o *interrupt* or impede the progress, movement, or procedure of[.]"[39] The Court of

---

[35] In fact, the instant case demonstrates the realistic danger that a wide range of people may enforce this MSU ordinance that imposes criminal consequences. After Rego's interaction with defendant, Rego called the university police, which he testified is standard procedure when an individual becomes upset about a parking ticket. Despite the fact that Rego was a parking enforcement officer without the power to make an arrest, criminal charges were brought against defendant for violating the MSU ordinance.

[36] *Hill*, 482 US at 465 (emphasis added).

[37] *Id*. at 467.

[38] *Rapp*, 293 Mich App at 165.

[39] Emphasis added. By its very nature, an interruption affects the "progress, movement, or procedure" of *something*. In fact, both the *Hill* ordinance and the MSU ordinance require the protected person to be doing something—the *Hill* ordinance prohibited interrupting an officer "in the execution of his duty," *Hill*, 482 US at 455, while the MSU ordinance prohibits disrupting a protected person's "activity," MSU Ordinance, § 15.05.

11

Appeals reasoned that a person can "interrupt an action without causing disorder or confusion, such as by merely asking a question," but "the same conduct does not necessarily disrupt . . . ."[40] The Court of Appeals then explained that its reasoning compelled the conclusion that while the term "interrupt" used in the *Hill* ordinance may encompass a substantial amount of constitutionally protected conduct, "the same can not necessarily be said" of the term "disrupt" used in the MSU ordinance.[41] We disagree with this analysis.

Under the definition chosen by the Court of Appeals, "disrupt" explicitly includes "interrupt." Other dictionaries similarly include "interrupt" in the definition of "disrupt."[42] Moreover, the terms "interrupt" and "disrupt" are commonly used as synonyms.[43] Nevertheless, the Court of Appeals' reasoning implies that the term "interrupt" is capable of encompassing verbal interruptions, thereby implicating constitutionally protected conduct, while the term "disrupt" is somehow limited to

---

[40] *Rapp*, 293 Mich App at 165.

[41] *Id*.

[42] *Random House Webster's College Dictionary* (2d ed, 2001) defines "disrupt" as "to destroy . . . temporarily, the normal continuance or unity of; interrupt: *to disrupt broadcasting*."

[43] Burton, *Legal Thesaurus* (2d ed) (New York: Macmillan Publishing Co, 1992), p 181; see also *Roget's II: The New Thesaurus* (3d ed) (Boston: Houghton Mifflin Co, 2003), pp 119, 290 (listing the terms "break," "discontinuance," "discontinuation," "discontinuity," "interruption," "pause," "suspension," and "disruption" as synonyms); Vocabulary.com <http://www.vocabulary.com/dictionary/interrupt> (accessed July 26, 2012) (listing the term "disrupt" as a synonym for the term "interrupt" and stating that "[t]o *interrupt* someone is to interfere in their activity, disrupt their conversation, or to disturb their peace and quiet").

nonverbal acts and thereby incapable of reaching protected conduct. However, nothing in the ordinary meanings of "interrupt" and "disrupt" supports this reasoning. More importantly, nothing in the ordinances at issue in *Hill* or this case creates that distinction.

The dictionary definition used by the Court of Appeals essentially provides that a person can "disrupt" another person by either (1) interrupting that person or (2) causing disorder or confusion.[44] Given this definition, one way to violate the MSU ordinance is to disrupt a person by interrupting that person. There is no question that the United States Supreme Court concluded in *Hill* that an ordinance broadly prohibiting interruptions reaches "a substantial amount of constitutionally protected speech . . . ."[45] A person may also violate the MSU ordinance, under this definition of "disrupt," by causing disorder or confusion. This means that if a person asks another person several questions, which causes that other person's activity to be "thrown into confusion or disorder," a prohibited disruption has occurred. Both ways in which a person may disrupt another person can be accomplished by purely *expressive* conduct.[46] And regardless of

---

[44] The dissent acknowledges this very same definition, yet it then asserts that only "*some* interruptions rise to the level of disruptions . . . ." *Post* at 11. This assertion is perhaps based on the dissent's view that the term "disrupt" requires the creation of "'confusion or disorder.'" *Post* at 6. While it is true that one way to "disrupt" a person is to create confusion or disorder, the quoted definition of "disrupt" clearly indicates that another way to "disrupt" a person is to "interrupt" that person.

[45] *Hill*, 482 US at 466.

[46] The dissent opines that the term "disrupt" suggests a "severe impediment" that "most often result[s] from a nonexpressive, physical disturbance rather than the verbal interjection of a viewpoint." *Post* at 6-7. The dissent ultimately concludes that the MSU ordinance reaches less protected expression than the *Hill* ordinance, yet the dissent also

13

which definition of "disrupt" is applied, the MSU ordinance can be used to reach and

criminalize "a substantial amount of constitutionally protected conduct."[47]

---

acknowledges that words or expressive conduct can "disrupt." See *post* at 7, 21. The task of the court is to determine whether the enactment reaches a substantial amount of protected activity. "[T]hose that make unlawful a substantial amount of constitutionally protected conduct may be held facially invalid even if they also have legitimate application." *Hill*, 482 US at 459. Moreover, the First Amendment protects more than just verbal speech. See *Tinker v Des Moines Indep Community Sch Dist*, 393 US 503; 89 S Ct 733; 21 L Ed 2d 731 (1969) (holding that a regulation prohibiting wearing armbands to schools in protest of the Vietnam War and providing for suspension of any student refusing to remove the armbands was an unconstitutional denial of students' right of expression of opinion); *Texas v Johnson*, 491 US 397; 109 S Ct 2533; 105 L Ed 2d 342 (1989) (holding that the defendant's act of burning an American flag during a protest rally was expressive conduct within the protection of the First Amendment); *Hill v Colorado*, 530 US 703; 120 S Ct 2480; 147 L Ed 2d 597 (2000) (holding that people have the right to protest, display signs, and pass out leaflets, but the state may reasonably regulate the time, place, and manner of these activities); *Cohen v California*, 403 US 15; 91 S Ct 1780; 29 L Ed 2d 284 (1971) (holding that the defendant could not be punished for walking through a courthouse wearing an offensive t-shirt).

[47] *Hoffman Estates*, 455 US at 494. Despite the fact that the MSU ordinance criminalizes constitutionally protected conduct, the dissent asserts that the ordinance is valid because "a university can implement measures to prevent disruptions of the academic environment." *Post* at 18. The dissent cites *Tinker*, 393 US 503, and *Hazelwood Sch Dist v Kuhlmeier*, 484 US 260; 108 S Ct 562; 98 L Ed 2d 592 (1988), as authority for this proposition. However, those cases do not support the dissent's position. Both *Tinker* and *Kuhlmeier* involved the constitutional rights of *minors* in public schools. While students do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate," *Tinker*, 393 US at 506, the United States Supreme Court acknowledged that "the constitutional rights of students in public school are not automatically coextensive with the rights of *adults* in other settings," *Bethel Sch Dist No 403 v Fraser*, 478 US 675, 682; 106 S Ct 3159; 92 L Ed 2d 549 (1986) (emphasis added). Given that minors do not automatically have the same rights as adults, the Court explained in both *Tinker* and *Kuhlmeier* that the rights of students must be "'applied in light of the special characteristics of the school environment . . . .'" *Kuhlmeier*, 484 US at 266, quoting *Tinker*, 393 US at 506. This case involves the constitutional rights of anyone who disrupts any person engaging in any activity with MSU and does not involve the unique issues that arise with regard to the rights of minors in public schools.

14

Finally, we note that our analysis is not affected by *Hill*'s observation of an anomaly in Texas law whereby the ordinance in that case was preempted to the extent that the Texas Penal Code already covered the proscribed conduct. Because Texas law preempted enforcement of that portion of the *Hill* ordinance that criminalized someone who "assault[s]" or "strike[s]" a police officer, "the enforceable portion of the ordinance" made it "'unlawful for any person to . . . in any manner oppose, molest, abuse or interrupt any policeman in the execution of his duty,' and thereby prohibits verbal interruptions of police officers."[48]

While defendant does not offer any Michigan law similar to the Texas preemption statute, we note that separate statutes and MSU ordinances already criminalize physical assaults. For instance, MSU Ordinance, § 22.01 provides that "[n]o person shall accost, molest, or harass any person upon the lands governed by the Board [of Trustees]." And, of course, MCL 750.81 criminalizes all assaults that occur within the state, regardless of whether they occur on MSU grounds. Thus, for all practical purposes, the only

_____

[48] *Hill*, 482 US at 460-461. The dissent appears to read the enforceable portion of the *Hill* ordinance too narrowly, stating that it applied *only* to verbal interruptions. However, *Hill*'s discussion of preemption does not support the dissent's position. In *Hill*, the United States Supreme Court explained that because the *Hill* ordinance made it "unlawful" to "interrupt" a police officer "in any manner," the ordinance prohibited verbal interruptions and, thereby, affected protected speech. *Hill*, 482 US at 461. *Hill* stated that preemption existed with regard to *physical assaults* and disorderly conduct and cited the relevant provisions in Texas law criminalizing that conduct; the Court concluded that, as a result of preemption, the enforceable provisions of the ordinance did not apply to the core criminal conduct attendant to physical assaults and disorderly conduct. However, *Hill* did not cite any Texas law that preempted *all* nonverbal interruptions of police officers, as the dissent suggests. The enforceable provisions of the *Hill* ordinance still covered many nonverbal interruptions as long as those interruptions were nonassaultive and did not rise to the level of disorderly conduct.

15

disruptions that the MSU ordinance *newly* criminalizes are the same nonphysical ones that the enforceable portion of the *Hill* ordinance proscribed. In other words, just as Texas law criminalized physical assaults on police officers in the absence of the *Hill* ordinance, state statutes and MSU ordinances already criminalize any physical assault that disrupts someone on the MSU campus even in the absence of MSU Ordinance, § 15.05.[49] As a result, the partial preemption of the *Hill* ordinance does not compel a different result in this case.

Accordingly, we hold that under *Hill*, the language in MSU Ordinance, § 15.05 making it an offense to "disrupt the normal activity" of a protected person is facially unconstitutional.

Next, we address whether MCR 7.101(O) allows taxation of costs in criminal appeals in the circuit court. MCR 7.101(O) provides:

> Costs in an appeal to the circuit court may be taxed as provided in MCR 2.625. A prevailing party may tax only the reasonable costs incurred in the appeal, including:
>
> (1) the cost of an appeal or stay bond;

___

[49] We reject any concerns that under our decision, certain nonassaultive campus disruptions, such as someone running onto a stadium field or playing loud music to disrupt a class in session, will now be permitted. Such hypothetical nonassaultive disruptions are already prohibited. For example, MSU Ordinance, § 15.06 prohibits an unauthorized person from entering the playing area of any athletic contest or exhibition while the contest or exhibition is in progress. Furthermore, § 15 of the MSU Ordinance Code specifically states that the operation of a sound amplifying device "in such a manner as to create a noise disturbance" is a violation of the section. Moreover, to the extent that other hypothetical nonassaultive disruptions may not be covered by existing prohibitions, the MSU Board of Trustees has the authority to establish new prohibitions against unprotected conduct "as it may deem necessary to secure the successful operation of the college and to promote its designed objects." MCL 390.106.

16

(2) the transcript;

(3) documents required for the record on appeal;

(4) fees paid to the clerk or to the trial court clerk incident to the appeal;

(5) taxable costs allowed by law in appeals to the Supreme Court (MCL 600.2441); and

(6) other expenses taxable under applicable court rules or statutes.

Defendant argues that he is entitled to reimbursement for the costs he incurred because the prosecution pursued its case against him on the basis of an unconstitutional statute. While the circuit court granted defendant's motion for taxation of costs, the Court of Appeals reversed that decision on the basis that there is no statutory authority allowing the assessment of costs in this matter. We agree with the Court of Appeals' analysis of this issue.

MCR 7.101(O) explicitly states that "costs . . . may be taxed as provided in MCR 2.625." MCR 2.625 is a rule of civil procedure, which does not apply to a criminal matter.[50] MCR 7.101(O)(5) refers to MCL 600.2441, a statute that applies only to the taxation of costs in civil matters.[51] Because this case is a criminal matter, MCR 7.101(O)

---

[50] While MCR 6.001(D)(2) generally applies the rules of civil procedure to criminal cases, that rule contains an exception "when it clearly appears" that the rules "apply to civil actions only[.]" MCR 2.625(A) allows "the prevailing party in an action" to be awarded costs, while MCR 2.625(B) further specifies which party is the prevailing party. These provisions clearly appear to "apply to civil actions only" within the meaning of MCR 6.001(D)(2) because they discuss, for example, the prevailing party in terms of "separate judgments," "different causes of action," and the "amount" of a judgment.

[51] MCL 600.2441(2) states that it applies "[i]n all civil actions or special proceedings in the circuit court . . . ."

17

does not provide grounds for awarding costs.[52]  Accordingly, the Court of Appeals correctly concluded that there is no basis to "undermine the broad statutory discretion granted the prosecution in its charging decisions,"[53] and the assessment of costs against the prosecution in this case was improper.

## IV.  CONCLUSION

We conclude that the language in MSU Ordinance, § 15.05 making it an offense to "disrupt the normal activity" of a protected person is facially overbroad, as articulated by the United States Supreme Court in *Hill*.  Therefore, we reverse the judgment of the Court of Appeals in part and reinstate the circuit court's decision to the extent that the circuit court held that the quoted language is facially unconstitutional.  On the issue of costs, we agree with the Court of Appeals' conclusion that the circuit court erroneously assessed costs against the prosecution and, therefore, we affirm the Court of Appeals' judgment in part.

Diane M. Hathaway
Robert P. Young, Jr.
Michael F. Cavanagh
Marilyn Kelly
Mary Beth Kelly

---

[52] Defendant's argument is essentially that the prosecution's case was frivolous. However, even under MCR 2.625(2), which governs taxation of costs for frivolous claims and defenses, costs may only be awarded in accordance with MCL 600.2591. MCL 600.2591(1) provides that "if a court finds that a civil action or defense to a civil action was frivolous, the court that conducts the civil action shall award to the prevailing party the costs and fees incurred . . . ."  Again, MCR 2.625 does not provide statutory authority for taxation of costs in this criminal matter.

[53] *Rapp*, 293 Mich App at 167.

18

STATE OF MICHIGAN

SUPREME COURT

PEOPLE OF THE STATE OF MICHIGAN,

      Plaintiff-Appellee,

v                                          No. 143343; 143344

JARED RAPP,

      Defendant-Appellant.

_____

ZAHRA, J. (*dissenting*).

      I respectfully dissent from the majority's conclusion that the language in Michigan State University (MSU) Ordinance, § 15.05 that makes it an offense to "disrupt the normal activity" of a protected person is unconstitutional under *City of Houston, Texas v Hill*.[1] Significantly, the issue of whether the ordinance was unconstitutionally applied to defendant for engaging in protected expression is not before this Court. Addressing defendant's facial challenge, the majority concludes that the overbreadth of the ordinance is so substantial that it must be struck down. The decision to strike down the instant ordinance, and thereby nullify a decision of the university's legislative body, is a matter of considerable consequence. This Court is responsible for upholding both the Michigan and federal constitutions, but its authority to invalidate laws is limited and must be predicated on a clear and apparent demonstration of unconstitutionality. Absent that

_____

[1] *City of Houston, Texas v Hill*, 482 US 451; 107 S Ct 2502; 96 L Ed 2d 398 (1987).

demonstration, the majority's decision, in my judgment, is an expansion of judicial power and an unwarranted encroachment on the legislative branch of government.

In my view, *Hill* does not provide sufficient grounds to conclude that MSU Ordinance, § 15.05 reaches a substantial amount of constitutionally protected expression relative to its plainly legitimate sweep. I am also not convinced that the ordinance presents a realistic danger of significantly compromising First Amendment freedoms. Finally, the majority fails to consider the context of the academic environment in reaching its decision. I would affirm the judgment of the Court of Appeals upholding MSU Ordinance, § 15.05 as constitutional on its face and remanding the case to the trial court for consideration of defendant's as-applied challenge.[2]

## I. THE OVERBREADTH DOCTRINE

Laws are presumed constitutional, and this Court must construe a law as constitutional unless its unconstitutionality is clearly apparent.[3] The burden of proving that a law is unconstitutional falls on the party bringing the challenge.[4]

---

[2] Although my conclusion that defendant does not prevail in his constitutional challenge makes it unnecessary for me to reach the second question presented in this appeal, I nonetheless agree with the majority and the Court of Appeals that MCR 7.101(O) does not permit the assessment of costs in criminal matters.

[3] *In re Request for Advisory Opinion Regarding Constitutionality of 2011 PA 38*, 490 Mich 295, 307; 806 NW2d 683 (2011); *People v Barton*, 253 Mich App 601, 603-604; 659 NW2d 654 (2002) (applying a presumption of constitutionality to an ordinance challenged on overbreadth grounds).

[4] *In re Request for Advisory Opinion Regarding Constitutionality of 2005 PA 71*, 479 Mich 1, 11; 740 NW2d 444 (2007).

2

Facial overbreadth, as alleged here, is a unique breed of constitutional challenge because of the competing social costs at issue.[5] The first concern is that the threat of enforcement of an overbroad law may have a chilling effect on protected expression, which is harmful because it deprives society of an uninhibited marketplace of ideas.[6] The fear is that the law's "very existence may cause others not before the court to refrain from constitutionally protected speech or expression."[7] To address this concern, the overbreadth doctrine allows parties to challenge laws without establishing the traditional standing requirements.[8] That is, it "allows a party to challenge a law written so broadly that it may inhibit the constitutionally protected speech of third parties, even though the party's own conduct may be unprotected."[9] Accordingly, "[t]he overbreadth doctrine is an exception to the traditional rule of practice that 'a person to whom a statute may constitutionally be applied will not be heard to challenge that statute on the ground that it may conceivably be applied unconstitutionally to others, in other situations not before the court.'"[10]

---

[5] *United States v Williams*, 553 US 285, 292-293; 128 S Ct 1830; 170 L Ed 2d 650 (2008).

[6] *Virginia v Hicks*, 539 US 113, 119; 123 S Ct 2191; 156 L Ed 2d 148 (2003).

[7] *Broadrick v Oklahoma*, 413 US 601, 612; 93 S Ct 2908; 37 L Ed 2d 830 (1973).

[8] *Id.* at 613.

[9] *In re Chmura*, 461 Mich 517, 530; 608 NW2d 31 (2000).

[10] *Id.*, quoting *Broadrick*, 413 US at 610.

"The consequence of our departure from traditional rules of standing in the First Amendment area is that any enforcement of a statute thus placed at issue is totally forbidden until and unless a limiting construction or partial invalidation so narrows it as to remove the seeming threat or deterrence to constitutionally protected expression."[11] The competing social cost of the overbreadth doctrine, therefore, is that it prevents a law from applying to constitutionally unprotected speech and even constitutionally unprotected conduct, which can result in obvious harm to society.[12] Accordingly, "[i]n order to maintain an appropriate balance, we have vigorously enforced the requirement that a statute's overbreadth be *substantial*, not only in an absolute sense, but also relative to the statute's plainly legitimate sweep."[13] Further, to invalidate a law, "there must be a realistic danger that the statute itself will significantly compromise recognized First Amendment protections of parties not before the Court . . . ."[14] Invalidation for overbreadth is "strong medicine" that should be used "sparingly and only as a last resort" and not "when a limiting construction has been or could be placed on the challenged statute."[15]

---

[11] *Broadrick*, 413 US at 613.

[12] *Hicks*, 539 US at 119.

[13] *Williams*, 553 US at 292.

[14] *Los Angeles City Council v Taxpayers for Vincent*, 466 US 789, 801; 104 S Ct 2118; 80 L Ed 2d 772 (1984).

[15] *Broadrick*, 413 US at 613.

## II. DEFENDANT FAILS TO DEMONSTRATE THAT THE ORDINANCE REACHES A SUBSTANTIAL AMOUNT OF PROTECTED EXPRESSION

In *Hill*, the Court struck down as facially overbroad a Houston ordinance making it "'unlawful for any person to assault, strike or in any manner oppose, molest, abuse or *interrupt* any policeman in the execution of his duty, or any person summoned to aid in making an arrest.'"[16] In contrast, MSU Ordinance, § 15.05 states, "No person shall *disrupt* the normal activity or molest the property of any person, firm, or agency while that person, firm, or agency is carrying out service, activity or agreement for or with the University."[17] In my view, the text of the Houston ordinance and the Supreme Court's stated reasons for striking it down are sufficiently distinguishable from this case that *Hill*, the sole basis for defendant's challenge, does not support the majority's conclusion that MSU Ordinance, § 15.05 reaches a substantial amount of protected expression.

The majority's use of *Hill* to guide its analysis is problematic in the first instance because it effectively turns the presumption of constitutionality on its head. Although the majority states that it "presumes that ordinances are constitutional,"[18] its analysis uses a case in which an ordinance was declared unconstitutional as a point of reference and from there reasons that no basis exists for not treating that case as controlling. The majority's analysis suggests a presumption of *unconstitutionality*. The majority's reliance on *Hill* is

---

[16] *Hill*, 482 US at 455, quoting Houston Ordinance, § 34-11(a) (1984) (emphasis added).

[17] Emphasis added.

[18] *Ante* at 4.

also problematic because it allows the majority to evade a traditional overbreadth analysis in what amounts to an attempt to fit a square peg into a round hole. Careful review reveals that the majority's analysis presents an oversimplified version of *Hill* that downplays its distinguishing aspects, creating only the appearance of a good fit.

Beginning with the most obvious distinction, the Houston ordinance made it unlawful to "interrupt" a police officer in the execution of his or her duties, whereas MSU Ordinance, § 15.05 makes it unlawful to "disrupt" the normal activity of a protected person carrying out an activity for or with MSU. Contrary to the majority's assertion, these terms are not used in a largely synonymous fashion by those who use the English language carefully, as judges must, and the majority's use of thesaurus references is misleading.[19] The term "interrupt" is defined as "[t]o break the continuity or uniformity of," whereas "disrupt" means "[t]o throw into confusion or disorder" or "[t]o interrupt or impede the progress, movement, or procedure of[.]"[20]

Significantly, the term "interrupt" typically carries a verbal connotation.[21] By contrast, the term "disrupt" carries a comparatively strong connotation that suggests not

---

[19] A thesaurus groups related concepts and provides a list of terms having similar meanings. A particular term may be more or less appropriate than another term given the particular context in which the term is being used. A thesaurus does not supply a list of synonymous terms that should be used interchangeably as if they have identical meanings.

[20] *The American Heritage Dictionary of the English Language* (2006).

[21] See Merriam-Webster <http://www.merriam-webster.com/dictionary/interrupt> (defining "interrupt" as "to stop or hinder by breaking in <interrupted the speaker with

6

merely a verbal interjection or expression of a viewpoint, but an actual and severe impediment to the carrying out of one's activities.[22] For example, in the context of a meeting, whereas a meeting may proceed once an interruption is over, a disruption will likely end the meeting. In my view, as this example illustrates, disruptions most often result from a nonexpressive, physical disturbance rather than the verbal interjection of a viewpoint.[23] This is not to say that it is impossible for a person to disrupt the normal activity of a protected person through words or expressive conduct. Nevertheless, "the mere fact that one can conceive of some impermissible applications of a statute is not sufficient to render it susceptible to an overbreadth challenge."[24]

The majority, however, construes the term "disrupt" as synonymous with "interrupt," relying primarily on its second dictionary definition, which is "[t]o *interrupt* or impede the progress, movement, or procedure of[.]" Using this definition, the majority

---

frequent questions>" or "to break in upon an action; *especially*: to break in with questions or remarks while another is speaking") (accessed July 26, 2012).

[22] The respective prefixes of "interrupt" and "disrupt" buttress this conclusion. The prefix "inter-" means between, reciprocal, or shared, whereas "dis-" connotes opposite action, deprivation, or exclusion. See Merriam-Webster <http://www.merriam-webster.com/dictionary/inter-> (accessed July 26, 2012); Merriam-Webster <http://www.meriam-webster.cm/dictionary/dis-> (accessed July 26, 2012).

[23] I am well aware that "the First Amendment protects more than just verbal speech." *Ante* at 14 n 46. As the majority notes, it also protects expressive conduct. See, e.g., *Tinker v Des Moines Indep Community Sch Dist*, 393 US 503; 89 S Ct 733; 21 L Ed 2d 731 (1969). My position, however, is that disruptions are typically *nonexpressive*, making the majority's discussion in footnote 46 of its opinion largely irrelevant.

[24] *Los Angeles City Council*, 466 US at 800.

concludes that MSU Ordinance, § 15.05 is comparable to the Houston ordinance because "a person can 'disrupt' another person by . . . interrupting that person . . . ."[25]

The majority's synthesis is not faithful to the language in the dictionary definition of "disrupt" or to MSU Ordinance, § 15.05. The second dictionary definition of "disrupt" is to interrupt *the progress*, interrupt *the movement*, or interrupt *the procedure* of. And MSU Ordinance, § 15.05 provides that "[n]o person shall disrupt *the normal activity* . . . of [a protected person]."[26] Thus, the ordinance language is focused not on disrupting the *person*, but on disrupting the *normal activity* in which the person is engaged. The following statement is a more accurate synthesis of the second dictionary definition of "disrupt" and MSU Ordinance, § 15.05: No person shall interrupt the progress, the movement, or the procedure of the normal activity of a protected person.

Interrupting the progress, the movement, or the procedure of a normal activity is a far cry from interrupting a person, and this difference indicates that MSU Ordinance, § 15.05 is less concerned with silencing speech and more concerned with allowing legitimate activities on campus to go unimpeded. The scope of the ordinance is further limited because a protected person's "normal activity" may include being verbally interrupted by other people. It is part of a professor's normal activity, for example, to be interrupted by students asking questions. It is likewise part of a police officer's or a parking enforcement officer's normal activity to be interrupted by having to respond to

---

[25] *Ante* at 13.

[26] Emphasis added.

legitimate questions from the public. MSU Ordinance, § 15.05 does not prohibit these interruptions. The majority, having relied primarily on the second dictionary definition of "disrupt," fails to discuss any of these subtleties or engage in any balancing analysis that takes into consideration the legitimate sweep of MSU Ordinance, § 15.05.

Applying the first dictionary definition of "disrupt," another way to violate the ordinance is to throw into confusion or disorder the normal activity of a protected person. Certainly, a person can interrupt without throwing into confusion or disorder the normal activity of a protected person—for instance, by asking a question.[27] Accordingly, while all disruptions may be considered interruptions (as suggested by the inclusion of "interrupt" in the second dictionary definition of "disrupt"), not all interruptions rise to the level of disruptions.[28] It is also no mistake that the term "disrupt" is not included in the dictionary definition of "interrupt," as one would expect if the terms were truly synonymous. Accordingly, the term "disrupt" carries a different meaning than "interrupt."

Nonetheless, according to the majority, disruptions that throw into confusion or disorder the normal activity of a protected person also implicate purely expressive conduct and, therefore, MSU Ordinance, § 15.05 reaches a substantial amount of

---

[27] See *People v Rapp*, 293 Mich App 159, 165; 809 NW2d 665 (2011).

[28] Although I tend to agree that anytime someone "disrupts" he or she also "interrupts," it does not follow, contrary to the majority's conclusion, that anytime someone "interrupts" he also "disrupts." In other words, one can interrupt without disrupting, but one cannot disrupt without interrupting.

protected expression under either dictionary definition of "disrupt." As an example, the majority asserts that "if a person asks another person several questions, which causes that other person's activity to be 'thrown into confusion or disorder,' a prohibited disruption has occurred."[29] The Court in *Hill*, however, addressed the majority's hypothetical example and concluded that a municipality may constitutionally punish such conduct. Specifically, the Court agreed with Justice Powell that "'a municipality constitutionally may punish an individual who chooses to stand near a police officer and persistently attempt to engage the officer in conversation while the officer is directing traffic at a busy intersection.'"[30] Stated differently, the interruption, expressive or otherwise, is not protected if it prevents the officer from directing traffic at a busy intersection. The Court explained, however, that a municipality may not do what Houston did, which was "to attempt to punish such conduct . . . by authorizing the police to arrest a person who *in any manner* verbally interrupts an officer."[31] MSU Ordinance, § 15.05, however, does not make it unlawful to *in any manner* disrupt a protected person. Rather, a disruption is prohibited only if it prevents a protected person from carrying out an activity for or with MSU, making it narrower than the Houston ordinance.

The linguistic differences between the ordinances reveal the logical fallacy employed by the majority. In essence, the majority reasons that, because the Supreme

---

[29] *Ante* at 13.

[30] *Hill*, 482 US at 462 n 11 (citation omitted).

[31] *Id*. (emphasis altered).

10

Court held that the term "interrupt" in the Houston ordinance reached a substantial amount of protected expression, and because *some* interruptions rise to the level of disruptions, then the term "disrupt" in the MSU ordinance also reaches a substantial amount of protected expression. This is a non sequitur—the conclusion does not follow from the premises. Rather, all that can be drawn from *Hill* is that MSU Ordinance, § 15.05 reaches less protected expression than the Houston ordinance.[32] This, of course, falls short of defendant's burden to establish *substantial* overbreadth, and it leaves this Court with insufficient grounds to invalidate the ordinance.

Furthermore, the majority effectively ignores a major facet of the Court's rationale in *Hill* for striking down the Houston ordinance. The Court interpreted the Houston ordinance as targeting speech and not core criminal conduct in large part because the Texas Penal Code preempted governmental subdivisions or agencies from enacting or enforcing laws that purported to criminalize any form of physical assault against a police officer, and the city conceded the issue of preemption in the Supreme Court.[33] The Court stated that, as preempted, "the enforceable portion of the ordinance deals not with core

---

[32] I find no relevance in the majority's observation that MSU Ordinance, § 15.05 "protects a much broader class of individuals than the ordinance at issue in *Hill*," *ante* at 8, because I do not believe that the prohibition against disrupting reaches a substantial amount of protected expression.

[33] *Hill*, 482 US at 460, 461 n 9. Given the city's concession, the Court chose not to address whether the ordinance would be substantially overbroad if not preempted by the Texas Penal Code. *Id*.

11

criminal conduct, *but with speech.*"[34]  The Court also stated that "[t]he enforceable portion of this ordinance is a general prohibition of speech that 'simply has no core' of constitutionally unprotected expression to which it might be limited."[35]  Indeed, given the extent of preemption, the Court went as far as to say that "limiting the ordinance to 'physical acts' would be equivalent to invalidating it on its face."[36]  Thus, the Court construed the enforceable portion of the ordinance as prohibiting only "*verbal interruptions of police officers.*"[37]  To the extent that the ordinance prohibited nonverbal interruptions or other physical affronts directed toward police officers, the ordinance was preempted.[38]

---

[34] *Id.* at 460 (emphasis added).

[35] *Id.* at 468 (citation omitted).

[36] *Id*. at 469 n 18.

[37] *Id*. at 461 (emphasis added).

[38] *Id*. at 460-461.  The Court noted that the Texas Penal Code broadly defined "assault" as including "any provocative contact with . . . any person," making it much broader than the traditional concept of assault.  *Hill*, 482 US at 460 n 8; Tex Penal Code Ann 22.01(a). Given that the Houston ordinance was preempted to the extent that it prohibited any provocative contact whatsoever, my reading of the enforceable portion of the ordinance as limited to verbal interruptions is not overly narrow.  Is not a physical interruption a form of provocative contact?  Further, the Court acknowledged that the Texas Penal Code did far more than preempt the enactment of laws criminalizing physical assaults.  As one example, the Court noted that the Houston ordinance was preempted to the extent that it criminalized disorderly conduct.  *Hill*, 482 US at 465 n 13; Tex Penal Code Ann 42.01. In any case, the majority concedes that the Court construed the Houston ordinance as unenforceable against many types of physical interruptions.  By contrast, the Michigan Legislature has not barred local units of government from enforcing ordinances that bar provocative or assaultive contact.  Thus, no part of the MSU ordinance is preempted. Therefore, the ordinance has a broader legitimate sweep than the Houston ordinance.

Given this limited construction, the Court sensibly concluded that the Houston ordinance criminalized a substantial amount of protected expression relative to its plainly legitimate sweep. In this case, however, neither defendant nor the majority identifies a Michigan law that preempts MSU Ordinance, § 15.05. Accordingly, it is enforceable against physical disruptions. Because the enforceability of the ordinance is not limited to mere verbal disruptions, it has a far broader legitimate sweep than the Houston ordinance.[39]

The majority asserts that because existing laws "already criminalize any physical assault that disrupts someone on the MSU campus . . . , the partial preemption of the *Hill* ordinance does not compel a different result in this case."[40] The majority's statement misses the point. It did not matter in *Hill* that Texas law already criminalized physical assaults on police officers; it mattered that the Texas Legislature had preempted the city from doing the same. Absent a similar preemption statute, the mere existence of MSU

---

The lack of preemption in this case is a significant distinction that the majority all but ignores.

[39] That MSU Ordinance, § 15.05 is not limited to verbal disruptions does not imply that the ordinance is somehow limited to nonverbal disruptions, and I disagree with the majority that the Court of Appeals implied that it is. *Ante* at 12-13 (asserting that "the Court of Appeals' reasoning implies that . . . the term 'disrupt' is somehow limited to nonverbal acts"). I agree fully with the Court of Appeals' statement that "while to 'interrupt' could be deemed, as it was in *Hill*, to reach a substantial amount of constitutionally protected conduct, the same can not necessarily be said of 'disrupt.'" *Rapp*, 293 Mich App at 165.

[40] *Ante* at 16.

13

ordinances and statutes criminalizing certain campus disruptions does not align this case with *Hill*.

For all these reasons, *Hill*, the sole basis for defendant's facial challenge, does not support the majority's conclusion that MSU Ordinance, § 15.05 reaches a substantial amount of constitutionally protected expression.

### III. DEFENDANT FAILS TO DEMONSTRATE A REALISTIC DANGER THAT THE ORDINANCE WILL SIGNIFICANTLY COMPROMISE FIRST AMENDMENT FREEDOMS

In addition to examining the language of an ordinance, it is appropriate to examine the likelihood of the ordinance's unconstitutional application. Even in a facial overbreadth challenge, the party bringing the challenge must demonstrate "a realistic danger that the statute itself will significantly compromise recognized First Amendment protections of parties not before the Court . . . ."[41] In *Hill*, the appellee introduced city records indicating the frequency with which arrests had been made under the Houston ordinance and the types of exchanges that had led to those arrests.[42] The United States Court of Appeals for the Fifth Circuit reasoned that the evidence provided by the appellee showed a realistic danger that the city's application of the ordinance significantly compromised protected expression, and the Supreme Court did not disturb that

---

[41] *Los Angeles City Council*, 466 US at 801.

[42] *Hill*, 482 US at 455.

14

conclusion.[43]  The Supreme Court further observed that the ordinance was "*admittedly*

violated scores of times daily . . . ."[44]

In this case, however, defendant provides no examples of protected expression that

the ordinance has or could prohibit, and his characterization of the behavior for which he

was cited as merely asking a parking official for his name is inconsistent with a fair

reading of the record.[45]  In particular, there is evidence that defendant drove toward the

parking official in his vehicle at an aggressive speed, leapt out of his vehicle, approached

the official in an aggressive manner, took pictures of the official with his cell phone,

yelled at the official regarding the ticket, and demanded to know the official's name.  In

response, and out of concern for what defendant might do next, the official returned to

the inside of his truck and summoned the university police for assistance.  Although I do

not opine on defendant's as-applied challenge, the record viewed as a whole belies

defendant's claim that he received a citation merely for interrupting a parking official to

ask for his name.  Defendant has also otherwise failed to show a history of enforcement

of the ordinance against protected expression.  Finally, unlike in *Hill*, no one has

*admitted* that the ordinance at issue in this case is violated scores of times daily by

---

[43] *Id*. at 457.

[44] *Id*. at 466 (emphasis added).

[45] Because this is a facial challenge, defendant is not required to show that the ordinance is unconstitutional as applied to him.  Nonetheless, he still must demonstrate that the ordinance presents a realistic danger of significantly compromising First Amendment freedoms.

persons engaging in protected expression.[46] Thus, I do not believe that defendant has demonstrated a realistic danger that MSU Ordinance, § 15.05 will significantly compromise First Amendment freedoms.

An ordinance's enforcement mechanism may also be relevant to whether the ordinance presents a realistic danger of significantly compromising protected expression, as the Court suggested in *Hill*. The Houston ordinance prohibited interrupting police officers, the same class of individuals with the discretionary power to arrest individuals under the ordinance. As the Court explained, "[t]he freedom of individuals verbally to oppose or challenge *police* action without hereby risking arrest is one of the principal characteristics by which we distinguish a free nation from a police state."[47] The Court

---

[46] The majority asserts that "the MSU ordinance *could* be violated numerous times throughout any given day" because "there are seemingly infinite ways" to disrupt a protected person. *Ante* at 8-9 (emphasis added). That "there are seemingly infinite ways" to disrupt, however, provides all the more reason to be concerned about the damaging effects that the majority's decision will have on legitimate law enforcement interests at MSU. By what alternative legal approach does the majority believe that MSU can address these "infinite" forms of disruptions other than by prohibiting "disruptions?" Moreover, the claim that the ordinance *could* be enforced frequently is beside the point if defendant has not demonstrated a likelihood that the ordinance will *actually* be enforced against protected expression and, as I believe, the prohibition against disruptions primarily regulates unprotected activity. There are several laws that are violated numerous times daily on MSU's campus (e.g., laws prohibiting speeding and the possession of alcohol by a minor). The mere prevalence of violations does not make a law constitutionally suspect if the law does not reach a substantial amount of protected expression. Given the majority's focus on the sheer number of violations as a barometer of unconstitutionality, does the majority understand the First Amendment as applying differently at a large campus such as MSU's than at a smaller campus such as Northern Michigan University's?

[47] *Hill*, 482 US at 462-463 (emphasis added).

16

also stated that it has "repeatedly invalidated laws that provide the *police* with unfettered discretion to arrest individuals for words or conduct that annoy or offend *them*."[48] Thus, the Court considered it especially concerning that enforcement of the Houston ordinance was entrusted to the sole objects of its prohibition. This feature of the ordinance presented an "'opportunity for abuse'" that the Court had previously admonished legislators to avoid[49] and made the ordinance "susceptible of regular application to protected expression."[50]

In this case, because the persons protected against disruptions are not limited to the police, there are many circumstances, including this case, under which enforcement of the ordinance is carried out by a neutral third party rather than left to the unfettered discretion of the object of the prohibition. Therefore, even if I were to assume that MSU Ordinance, § 15.05 reaches a substantial amount of protected expression, which I do not, it presents a reduced opportunity for abuse and is less susceptible of regular application to protected expression than the Houston ordinance.[51]

---

[48] *Id*. at 465 (emphasis added).

[49] *Id*. at 466, quoting *Lewis v New Orleans*, 415 US 130, 136; 94 S Ct 970; 39 L Ed 2d 214 (1974) (Powell, J., concurring in the result).

[50] *Hill*, 482 US at 467.

[51] The majority's claim that the concerns regarding the enforcement mechanism of the Houston ordinance "apply equally" here, *ante* at 10, is flawed. The majority fails to consider the broader legitimate sweep of MSU Ordinance, § 15.05, which protects more than the police. Further, the majority's observation that the ordinance is "a criminal statute that subjects the violator to a misdemeanor conviction and provides someone who *does* have the power to arrest with the opportunity to do so," *ante* at 10-11, only serves to

IV. CONSIDERATIONS OF THE ACADEMIC ENVIRONMENT

It is apparently of little consequence to the majority that this case concerns an ordinance adopted by an institution of higher education. To the extent that an academic environment is at issue in this ordinance, it is far more likely that speech-related activities (both inside and outside the classroom) will be the *object* of disruptions than that such activities will be undermined by the *prohibition* against disruptions. In this way, the ordinance as written may actually serve to promote the dissemination of ideas rather than threaten them.

Further, just as picketing outside courthouses[52] disruptive rallies within libraries,[53] and speech that disrupts the workplace[54] can be constitutionally prohibited, a university can implement measures to prevent disruptions of the academic environment.[55] Even

state the obvious—the police are responsible for enforcing our criminal laws and, of course, even police officers are sometimes the victims of crimes.

[52] See *Cameron v Johnson*, 390 US 611, 617; 88 S Ct 1335; 20 L Ed 2d 182 (1968) (upholding a statute that prohibited picketing that "obstructs or unreasonably interferes with ingress or egress to or from the courthouse").

[53] See *Brown v Louisiana*, 383 US 131, 142-143; 86 S Ct 719; 15 L Ed 2d 637 (1966) (suggesting that a state or its instrumentality may prohibit "*disruption*[*s*] of library activities" in a reasonable and nondiscriminatory manner) (emphasis added).

[54] See *Waters v Churchill*, 511 US 661, 680-681; 114 S Ct 1878; 128 L Ed 2d 686 (1994) (explaining that speech by public employees that *disrupts* the workplace is unprotected, regardless of whether the speech is on a matter of public concern).

[55] See *Tinker*, 393 US at 513 (declaring that "conduct by the student, in class or out of it, which for any reason . . . materially *disrupts* classwork or involves substantial disorder or invasion of the rights of others is, of course, not immunized by the constitutional guarantee of freedom of speech") (emphasis added). Although *Tinker* involved high school students, courts have applied *Tinker* in the university setting. For example, in

campus newspapers are not entitled to the same degree of free speech as the *Lansing State Journal* because of the particular mission of the university.[56]  By striking down MSU Ordinance, § 15.05, the majority is not only compromising the ability of parking

---

*Salehpour v Univ of Tennessee*, 159 F3d 199, 208 (CA 6, 1998), the United States Court of Appeals for the Sixth Circuit, citing *Tinker*, held that the plaintiff's disruption of the classroom environment at the university was unprotected.  The court stated that

> where the expression appears to have no intellectual content or even discernable purpose, and amounts to nothing more than expression of a personal proclivity designed to *disrupt* the educational process, such expression is not protected and does violence to the spirit and purpose of the First Amendment.  *Tinker*, 393 U.S. at 511.  The rights afforded to students to freely express their ideas and views without fear of administrative reprisal, must be balanced against the compelling interest of the academicians to educate in an environment that is free of purposeless distractions and is conducive to teaching.  Under the facts of this case, the balance clearly weighs in favor of the University.  [*Id.* (emphasis added; citation omitted).]

Furthermore, the United States Supreme Court, in recognition of its decision in *Tinker*, stated that

> [a] university differs in significant respects from public forums such as streets or parks or even municipal theaters.  A university's mission is education, and decisions of this Court have never denied a university's authority to impose reasonable regulations compatible with that mission upon the use of its campus and facilities.  [*Widmar v Vincent*, 454 US 263, 268 n 5; 102 S Ct 269; 70 L Ed 2d 440 (1981).]

In this case, MSU has implemented a reasonable, content-neutral regulation that is consistent with its mission as an educational institution.  The regulation prohibits disruptions to the normal activity of persons carrying out a service, activity, or agreement for or with MSU.

[56] See *Hazelwood Sch Dist v Kuhlmeier*, 484 US 260, 273; 108 S Ct 562; 98 L Ed 2d 592 (1988) ("hold[ing] that educators do not offend the First Amendment by exercising editorial control over the style and content of student speech in school-sponsored expressive activities so long as their actions are reasonably related to legitimate pedagogical concerns").

officials to safely respond to irate behavior, but it is also preventing MSU from regulating numerous other disruptive activities that interfere with its core academic mission.

Finally, it is useful to consider the campus disruptions that MSU Ordinance, § 15.05 will no longer cover because it has been partially struck down by the majority: (1) a person running onto the field of a stadium during a sporting event, (2) a person blaring music during a lecture, (3) a person interfering with the progress or movement of an individual  cleaning or maintaining a university building, (4) a person preventing the entrance of students into a classroom by physically blocking the classroom door, (5) a person shining a laser pointer during a performance or lecture, (6) a person turning the lights on and off in a classroom during an exam, (7) a person continually making noise in the library, (8) a person calling in a false bomb threat, and (9) a person pulling a fire alarm in the absence of a fire emergency.  These are just a few of the countless nonexpressive campus occurrences that might throw into confusion or disorder the normal activity of a protected person.  These illustrations highlight the tangible consequences of the majority's decision.[57]

---

[57] As another consequence, the majority's decision may well invalidate several other campus prohibitions.  MSU Ordinance, § 15.01 prohibits "any excessive noise or disturbance, riot, raid, or *disruption . . .* which obstructs the free movement of persons about the campus or the free and normal use of University buildings and facilities, or prevents or obstructs the normal operations of the University" (emphasis added); MSU Ordinance, § 15.02 provides that "[n]o person shall *disrupt* the normal operation of any properly authorized class, laboratory, seminar, examination, field trip, or other education activity of the University" (emphasis added); and MSU Ordinance, § 15.03 provides that "[n]o person shall *disrupt* the normal use of any campus building or area which has been assigned or scheduled by appropriate means for educational or extracurricular activities" (emphasis added).  These ordinances not only illustrate the range of laws that might be

## V. CONCLUSION

For the foregoing reasons, I conclude that *Hill* provides insufficient grounds for this Court to invalidate MSU Ordinance, § 15.05.  At best, *Hill* supports the conclusion that the ordinance reaches less protected expression and presents less danger of compromising First Amendment freedoms than the Houston ordinance.  I also consider it significant that this ordinance was adopted by an academic institution.  Because *Hill* provides the sole basis for defendant's overbreadth challenge, I do not believe that defendant has met his burden in this case.  Accordingly, I dissent from the majority opinion and would instead affirm the judgment of the Court of Appeals, which upheld MSU Ordinance, § 15.05 as constitutional on its face and remanded the case to the circuit court for consideration of defendant's as-applied challenge.


Brian K. Zahra
Stephen J. Markman

---

placed at risk by the majority in the very limited context of this one university, but also, each of these ordinances is relatively clear in communicating a sense that a "disruption" is distinct from a mere "interruption."